**FONAR CORPORATION and Dr. Raymond Damadian, Plaintiffs,**

v.

**JOHNSON & JOHNSON and Technicare Corporation, Defendants.**

Civ. No. 82–2751–K.

United States District Court, D. Massachusetts.

Jan. 10, 1986.

Final Judgment Jan. 31, 1986.

Robert S. Frank, Jr., Mitchell H. Kaplan, Choate, Hall & Stewart, Boston, Mass., Sidney David, Joseph S. Littenberg, John R. Nelson, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, N.J., for plaintiffs.

Herbert Weissblum, Reimer & Braunstein, Boston, Mass., Stephen B. Judlowe, Francis J. Murphy, Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City, of counsel, Roger S. Fine, New Brunswick, N.J., Lerner, Westfield, N.J., for defendants.

KEETON, District Judge.

Patent No. 3,789,832, issued to Dr. Raymond Damadian, concerns a method and apparatus for detecting cancer. The complaint in this case alleges that methods and apparatus for Nuclear Magnetic Resonance (NMR) imaging, also called Magnetic Resonance Imaging (MRI), infringe claims of the patent. At the commencement of trial, plaintiffs waived contentions other than those related to alleged infringements of methods described in Claims 1, 2, 7, 8, and 10 of the patent.

The liability phase of the case was tried before a jury in October and November 1985. In answer to interrogatories submitted in accordance with Fed.R.Civ.P. 49(a), the jury, as to each claim, found against the defense contentions

"that the subject matter of the claim was not an art involving more than an insignificant or trivial method or process and was instead a phenomenon of nature," Question 1;

"that the specification fails to state with required clarity and particularity how to make and use the invention," Question 3(a);

"that the differences between the subject matter of the claimed invention and the prior art were such that the subject matter of the claimed invention, as a whole, would have been obvious in 1970 to a person having ordinary skill in the art to which that subject matter pertains," Question 4; and

"that, during the examination of the patent, Dr. Damadian or his attorney failed to disclose to the Patent Office relevant information that they knew or should have known that a reasonable examiner would have considered important in allowing or rejecting the application," Question 5.

As to Claims 1 and 2, the jury also found against defense contentions

"that no claimed result was attainable by the steps stated in the claim," Question 2, and

"that the claim fails to particularly point out and distinctly claim the subject matter of the alleged invention," Question 3(b),

but the jury sustained these two defense contentions as to Claims 7, 8, and 10 of the patent.

Also, in answering Question 6 and 7 regarding infringement (including infringement, inducing infringement, and both infringement and inducing infringement under the doctrine of equivalents), the jury found for plaintiffs as to Claims 1 and 2 of the patent, but found against plaintiffs as to Claims 7, 8, and 10 of the patent.

Now before the court are the parties' motions for judgment, defendants asking (inter alia) that the court disregard the jury's findings of infringement of Claims 1 and 2 of the patent. At the time of declining to grant defendants' motions for directed verdict, I explicitly reserved judgment, determining that as a matter of sound judicial administration I should submit the case to the jury and consider the grounds of the defense motion more fully

should the verdict make that necessary. Having now given full consideration to the submissions of the parties, I conclude that judgment must be entered for defendants as to all claims of infringement, notwithstanding the jury answers of infringement of Claims 1 and 2 of the patent.

I.

For at least several decades before the 1970s, NMR was well known, though the developed, practical uses were few. It was known that tissue, placed in a magnetic field, after being excited by another, orthogonal magnetic pulse, releases electromagnetic waves (detectable by radio frequency) as it returns to its unexcited state. By 1970, available NMR equipment could be used to measure these electromagnetic waves and determine the spin-lattice ($T_1$) and spin-spin ($T_2$) NMR relaxation response times of tissue returning to normal state after excitement. It was also known that tissues of different types have different $T_1$ and $T_2$ values (relaxation times).

By 1970, Dr. Damadian had come to believe that $T_1$ and $T_2$ values for cancerous tissue differ from $T_1$ and $T_2$ values for noncancerous tissue. Evidence as to the originality of his theory was to some extent disputed at trial, but at the least Dr. Damadian was a pioneer in efforts to find ways of putting knowledge and theory about $T_1$ and $T_2$ values of different tissues to use in detecting cancer.

In 1970, using a state-of-the-art NMR spectrometer, Dr. Damadian determined $T_1$ and $T_2$ values for two types of cancers induced in test rats and $T_1$ and $T_2$ values for other, noncancerous tissues from these and other rats. His results supported his hypothesis that $T_1$ and $T_2$ values of cancerous tissues differ from those of noncancerous tissues. He published his findings in a scientific journal, together with observations about their practical significance.

Within a time period that averted a challenge to the patent at issue as matter within the public domain, he filed an application for the patent that described two embodi-

ments of apparatus. The Figure 1 embodiment described methods of placing tissue to be examined in a very small locus such that state-of-the-art NMR equipment could be used to determine $T_1$ and $T_2$ values of the tissue. Claims 1 and 2 of the patent were associated with the Figure 1 embodiment.

The Figure 2 embodiment described apparatus that would create a magnetic field large enough for an entire human being to be placed within it. Claims 7, 8, and 10 of the patent were associated with the Figure 2 embodiment. Both at the time of application and at the time of patent issuance, no apparatus of the type described in Figure 2 had been developed either by Dr. Damadian and his assistants or by anyone else.

At no place in the patent application, or in any other documents in evidence that were written before the patent was issued, does the word "imaging" or any derivative or synonym appear. For reasons developed more fully in Part IV, below, plaintiffs' arguments that passages in the application somehow refer to imaging are, to put the point mildly, interpretations that the words will not bear. Of course, the fact that the application did not seek a patent for imaging apparatus or method is not conclusive against plaintiffs in this action. It must nevertheless be determined whether the defendants' imaging apparatus, and methods of use they induce, practice any of the methods claimed in the Damadian patent.

Plaintiffs placed in evidence in the presence of the jury, without objection, the fact that Dr. Damadian was the first to succeed, in the late 1970s, in constructing a functioning apparatus large enough to permit a person to be placed in a magnetic field for NMR imaging. This extraordinary achievement also, however, is not decisive of the issues in the present case. The evidence offered at this trial did not disclose exactly how that apparatus functioned and whether it practiced any of the methods claimed in Patent No. 3,789,832 (unless all imaging apparatus does so—a contention rejected in Part IV, below).

The evidence did disclose, however, that commercial NMR scanners now in use, including all scanners marketed by defendant Technicare, form an image by displaying NMR response signal strength (amplitude) measured for each locus (pixel) to form an image on a screen by showing contrasts among the many dots (representing pixels) on the screen (in shades from white to black, or in color).

The signal amplitude from each locus comes from hydrogen protons in that locus and depends upon three factors, of which $T_1$ and $T_2$ are by far the greater contributors. The signal strength, though not recorded in the ordinary functioning of scanners, is measurable in units of amplitude of the signal, also referred to as signal intensity. In contrast, $T_1$ and $T_2$ values are units of time. Although $T_1$ and $T_2$ can be calculated, the formulae for doing so are complex. Nevertheless, the calculation can be readily accomplished by computer. However, imaging apparatus need not, and does not as routinely used, compute $T_1$ and $T_2$ values. The contrast of shades, or colors, of pixels that create the image on the screen are derived from comparison of the strength of the signals from the different pixels. The NMR signal has a single value for each pixel, and neither that particular value, nor the value of any component that contributes to it, is itself significant to imaging. Rather, it is the comparison between that value and the values of other pixels that is used to develop the contrasts that make the image. Indeed, current imaging equipment allows the operator to make an equipment adjustment when the contrasts are either slight or great, to sharpen or decrease contrast and produce more useful images. Thus, it is not measured standards of $T_1$ and $T_2$ that are used in imaging but contrasts of signal strength among those pixels that are within the scope of the image.

## II.

Issues were narrowed at trial to the method claims stated in Claims 1, 2, 7, 8, and 10, which are as follows:

1. A method for detecting cancer comprising:

a. measuring and establishing standard NMR spin-lattice relaxation times and spin-spin relaxation times for both normal and cancerous tissue of the type under analysis using as an indicator nuclei at least one nuclei which exhibits deviant behavior in cancerous tissue;

b. measuring the NMR spin-lattice relaxation times and spin-spin relaxation times for the suspected tissue to determine the extent of deviant behavior of the indicator nuclei; and

c. comparing the values obtained in (b) against the standards obtained in (a).

2. The method of claim 1, wherein the indicator nuclei are cell water protons.

· · · · ·

7. A method of detecting cancerous mammalian tissue comprising:

a. providing a magnetic field space having a locus therein of equal field and strength;

b. positioning a mammal within said space;

c. directing a beam of magnetic radiation having a predetermined frequency to impinge on said locus in a direction orthogonal to the direction of the magnetic field, the frequency being selected to permit absorption by selected nuclei in the region of impingement of energy from the beam through nuclear magnetic resonance absorption, thereby inducing transitions in the selected nuclei between equilibrium states and higher energy states;

d. terminating the beam after a predetermined duration;

e. measuring the spin-lattice relaxation time and the spin-spin relaxation time values as the energized nuclei return to their equilibrium states; and

f. comparing the values obtained in (e) with predetermined like values for normal and for cancerous tissue, said comparison indicating the existence and degree of malignancy.

8. A method according to claim 7 further comprising scanning the beam of magnetic radiation across the locus.

· · · · ·

10. A method according to claim 7, wherein the selected nuclei comprise water protons.

· · · · ·

### III.

The central dispute in this case is not about legal rules but about proper or at least permissible interpretations of Claims 1, 2, 7, 8, and 10 of the patent and whether reasonable persons could find that the evidence supports contentions of infringement of the method claims as permissibly interpreted.

There is a dispute as to the most appropriate way to state the legal rules bearing on claim construction, but, even this is not a *material* dispute of law.

Defendants argue that claim construction is a matter of law for the court, not the jury, citing *Molinaro v. Fannon/Courier Corp.*, 745 F.2d 651, 654 (Fed.Cir.1984); *ACS Hosp. Systems, Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1577 (Fed.Cir.1984) and the authorities there cited; *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 956 (Fed. Cir.1983), *cert. denied*, —— U.S. ——, 105 S.Ct. 127, 83 L.Ed.2d 69 (1984); *Fromson v. Advanced Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed.Cir.1983); *SSIH Equipment SA v. U.S. ITC*, 718 F.2d 365, 376 (Fed.Cir.1983).

Plaintiffs, on the other hand, argue that "claim construction" is to be resolved by a two-part analysis involving, first, ascertaining the scope of the claims and, second, determining whether the claims cover the accused method. They argue that even the first step is for the jury if "the meaning of a term of art in the claims is disputed," *McGill, Inc. v. John Zink Co.*, 736 F.2d 666, 671–72 (Fed.Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984), and that the second step is for the jury, *Palumbo v. Don-Joy Co.*, 762 F.2d 969, 974 (Fed.Cir.1985); *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed.

Cir.1984); *Fromson v. Advanced Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed.Cir. 1983).

The issue as to whether, as plaintiffs argue, determining that claims do or do not cover the accused method is a part of "claim construction" is perhaps more semantic than substantive. In any event, assuming plaintiffs' formulation of the applicable legal rules to be correct does not affect the outcome in this case, because of an implicit qualification. That is, even when an issue is treated as one of "fact" rather than "law," the court must grant judgment notwithstanding the verdict

> when the court is convinced: ... that reasonable persons could not in light of the evidence have found the facts necessary to support the jury's verdict; ....

*Weinar v. Rollform, Inc.*, 744 F.2d 797, 805 (Fed.Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 1844, 85 L.Ed.2d 143 (1985). Applying this rule to the issue of construction of a claim, the court, if convinced that reasonable persons properly instructed on the law could not interpret a claim in a way that would support the plaintiffs' contention, must direct a verdict against the plaintiffs as to that contention or, having allowed the matter to go to the jury, must disregard any impermissible finding of the jury on motion for judgment notwithstanding the verdict. Apart from this one qualification, which was neither stated nor challenged in plaintiffs' post-trial submission, I need not and do not consider the contrasting implications—for other cases—of the somewhat different ways in which plaintiffs and defendants describe the roles of court and jury in "claim construction."

Of course, in examining the text of the claims and all other relevant evidence to determine whether reasonable persons could interpret a claim in a way that would support infringement, all instances of allowable differences of interpretation by reasonable persons must be resolved in plaintiffs' favor.

### IV.

A reading of the five claims at issue in this case discloses that they have in common one characteristic. Each of them expresses a limitation that the method claimed measures the NMR spin-lattice ($T_1$) and spin-spin ($T_2$) relaxation times for both normal and cancerous tissue to establish contrasting standard values for normal and cancerous tissues, also measures $T_1$ and $T_2$ for suspected tissue, and then determines whether or not it is cancerous (thereby detecting cancer if it exists) by comparing the $T_1$ and $T_2$ values of the suspected tissue with the standard values.

The evidence before the court in this trial would not support a finding that any person has yet succeeded in using this method to detect cancer or any other disease or abnormality. Interpreted most favorably to plaintiffs, the evidence is that the NMR imaging methods (now used by plaintiffs, by defendants, and by others) instead determine (or, I will assume in plaintiffs' favor, "measure") the intensity of the NMR signals emitted from localized points in body tissues, plot (with computer assistance) the pattern of the intensity of the different signals from different localized points to form images upon a screen, and use those images in diagnosis of cancer and other abnormalities. Thus, the revealing comparison is not between $T_1$ and $T_2$ values for suspected tissue of a particular type in a particular human body, on the one hand, and standard values, on the other hand, but instead is between intensity of signals emitted by tissues side by side in the human body, which, because of the different qualities of the tissues, whether diseased or not, produce different signal intensities and, when plotted, produce an image. Because of normal differences among body tissues, this method produces an image even if all tissues are normal. Detecting cancer by this method depends not on determining that $T_1$ and $T_2$ values match a standard for cancerous tissue but instead upon inferences of a diagnostician from the shapes and locations of images, and from the diagnostician's comparison of images rather than comparison of $T_1$ and $T_2$ values.

Plaintiffs argue that infringement of the methods stated in Claims 1 and 2 is never-

theless proved because the respective intensities of the NMR signals received from the multitude of different points within the imaged tissues are functions of only three variables, two of which are $T_1$ and $T_2$ values and the third of which has far less influence than $T_1$ and $T_2$ have on the intensity of the signal. It is true that the evidence clearly supports this factual observation, but the conclusion for which plaintiffs argue cannot be accepted by a reasonable reader of the claims or by a reasonable person finding the facts upon the evidence before the court and jury in this case.

In an effort to escape the force of the undisputed language of the claims and the undisputed facts, plaintiffs advance a series of arguments attaching special meanings to key words.

In some instances, the attributions of meaning that plaintiffs advance are at least arguably within permissible limits. For example, one of the steps of the patent claims is "measuring" $T_1$ and $T_2$ values. But witnesses testified that $T_1$ and $T_2$ cannot be measured and must instead be calculated or computed from measurements of other values. Even plaintiffs' principal expert witness (Dr. Lufkin) insisted that $T_1$ and $T_2$ cannot be "measured" and instead must be computed by use of complex formulae. Undaunted by the insistence of their own expert, plaintiffs argue that one may measure indirectly as well as directly, and may in the process use computers and complex formulae as instruments of measurements. Of course, a party is not judicially estopped by the idiom in which its expert witness chooses to express expert opinion testimony. And, in this instance, I would be inclined to accept plaintiffs' argument as a permissible interpretation of "measuring" unless it should be determined, as defendants argue, that "file wrapper estoppel" and other theories of context preclude the interpretation plaintiffs now advance. This issue seems debatable. But, for reasons stated below, I need not decide it.

Another debatable attribution of meaning is reflected in an ongoing controversy, extending throughout trial and in post-trial submissions. Plaintiffs contend that one can "detect" cancer without making a "diagnosis" of cancer, and defendants contend that "detecting cancer" necessarily implies that it is cancer that is detected and not some other abnormal, or even normal, tissue that produces an image different from that of adjacent tissues. As to this dispute, also, I conclude that I need not determine whether plaintiffs' argument of meaning is an interpretation of "detecting cancer," as that phrase is used in the patent, that a reasonable person might adopt.

Plaintiffs also argue that any method that makes use of the intensity of NMR signals in plotting an image is literally "measuring" $T_1$ and $T_2$ and, in the alternative, is at least equivalent to measuring those values. The validity of this step of plaintiffs' argument is in doubt for reasons already stated, but I need not and do not decide the case on this basis.

The critical remaining step of plaintiffs' argument is that imaging is, or is equivalent to, comparing the measured $T_1$ and $T_2$ values of suspected tissue with standard values in order to detect cancer if it exists in the suspected tissue.

In this respect plaintiffs propose a truly extraordinary meaning of key words of the patent claims. I conclude that it is impermissible—a meaning that cannot be accepted by a reasonable person, either when the words are examined standing alone or when they are examined in the context of the patent application and with the benefit of all the evidence received in this trial, viewed most favorably to plaintiffs.

The words to which this impermissible contention of meaning refers are the words, in Claims 1 and 2, "measuring and establishing *standard*" values for $T_1$ and $T_2$ in cancerous and in normal tissues, "measuring" $T_1$ and $T_2$ for suspected tissue, and "comparing the values" for the suspected tissue "against the *standards*" for healthy and cancerous tissue (emphasis added). The meaning plaintiffs seek to attribute to these phrases and in particular to what these phrases say about *standards* established by *measuring* is wholly beyond

the scope of any permissible interpretation that a reasonable person could accept. Additional contextual detail will help to make this point even clearer than is apparent at once from merely reading these phrases in context.

Plaintiffs argue that they are relying on method, not apparatus, claims, and that it is not defendants' apparatus but instead the users of the apparatus who are induced by defendants and their apparatus to practice the method, or methods, of Claims 1 and 2. But not even the most experienced and sophisticated users of NMR scanning apparatus practice the first of the method steps described in Claims 1 and 2—that is, "measuring and establishing standard" NMR spin-lattice ($T_1$) relaxation times and standard spin-spin ($T_2$) relaxation times for both cancerous tissues and healthy tissues of the type under analysis. Indeed, the evidence would not support a finding that anyone has yet established any $T_1$ and $T_2$ standards for cancerous and healthy human tissues. Efforts to do so have revealed a phenomenon that $T_1$ and $T_2$ values of cancerous tissues of some types overlap significantly with $T_1$ and $T_2$ values for normal tissues of other types (and perhaps even to a substantial extent with normal tissues of the same type). There was no evidence offered at this trial to support a finding that anyone has yet been able to solve this problem of overlapping and compile standard values that could be used in detecting cancer by the method described in Claims 1 and 2.

Also, plaintiffs' argument that NMR imaging apparatus users practice all steps of the method of Claims 1 and 2 fails because there is no evidence to support a finding that users practice either the second step (of Claims 1 and 2) of measuring the $T_1$ and $T_2$ relaxation times of suspected tissue or the third step of comparing the measurements for the suspected tissue with the standards for healthy and cancerous tissues.

The argument becomes a distortion of common sense meaning when plaintiffs assert that a diagnostician is "measuring and establishing standard" NMR relaxation times when, with accumulated experience, the diagnostician learns to draw inferences from the shapes of images observed during extensive experience, stores in personal memory those images as standards, and then compares the standards with the images seen as the diagnostician examines suspected tissue for the purpose of detecting cancer. The words of Claims 1 and 2 will not bear the interpretation plaintiffs thus place upon them to make them so sweeping that they cover all uses of NMR imaging apparatus to detect cancer. Perceptive and pioneering as the patent application may have been, it cannot reasonably be read as a forecast of NMR imaging. The evidence will not support an interpretation of what users of NMR imaging apparatus do that describes their use as "measuring and establishing standard" NMR $T_1$ and $T_2$ relaxation times for both cancerous tissues and healthy tissue of various types, then measuring $T_1$ and $T_2$ of suspected tissue, and finally comparing these measured values with the standards.

For these reasons I cannot sustain plaintiffs' argument that the jury's answers should be construed as findings supported by evidence that using comparative intensity values of NMR signals from adjacent tissues to produce images is, or is the equivalent of, practicing the several steps of the methods of Claims 1 and 2.

As noted above, the comparison that occurs in imaging is one between tissues side by side, which because of NMR signal intensity values to which $T_1$ and $T_2$ values contribute, show up alike or in contrast with each other in the resulting image. Not only do normal and cancerous tissues of a given type tend strongly to show contrasts. So also do normal tissues of different types.

In summary, the evidence before the court in this trial would not support a finding that the accumulated scientific knowledge about $T_1$ and $T_2$ values for various types of tissues is sufficient even today, much less at the time of the Damadian patent, to enable anyone, no matter how

exceptionally skilled, to prepare a set of standards that would, by reference to $T_1$ and $T_2$ values, distinguish cancerous from normal tissue. An optimist may hope that it will yet be possible to develop such standards—such "markers" of cancer as they have been characterized in the evidence in this case. But no such standards existed in 1970, nor do they exist today. Thus, methods of imaging in use today do not use this method and cannot be found to be infringements of this method. Since this method is common to all of the claims at issue in this case, no infringement has been or could have been proved.

In reaching these conclusions about the claims at issue and the alleged infringements of these claims, I have taken into account not only the language of these claims but as well the patent specification, the prosecution history of the patent, all other claims in the patent, all expert testimony offered at trial, and all other circumstances in evidence regarding the context. Neither in the language of the claims at issue nor in any other evidence before the court and jury in this case is there support for a finding of infringement of Claims 1 and 2 (or, for that matter Claims 7, 8, and 10, as to which the jury has made plainly supportable findings of no infringement).

Granting a judgment notwithstanding the jury's findings of infringement of Claims 1 and 2 is, of course, holding their findings impermissible. I emphasize, however, that I am not critical of the jury's performance of its function in this case. Indeed, the jury was attentive and in my view serious and thoughtful in their consideration of the evidence. Had I instructed them fully, clearly, and correctly on the law applicable to claim construction as applied to the evidence in this case, the instructions would necessarily have made clear that they could not properly credit the principal arguments of plaintiffs, referred to in this Opinion and rejected as impermissible. Though tentatively, at the time of submitting the case to the jury, holding the views I have now expressed in this Opinion, I instructed only in more general terms and held back from giving instructions that, though correct, would have been nearly equivalent to directing a verdict. Thus, though I concluded for reasons of judicial administration that this was the wiser course after the heavy investment of public and private resources in a lengthy trial before a jury, it is a course that runs the risk of conveying to the jury, by inference from the court's failure explicitly to reject key arguments made by counsel, the message that those arguments are legally permissible. Having taken that course and run that risk, the court must accept the responsibility for entering judgment notwithstanding the verdict, even though its doing so may quite properly be viewed at least as much as a correction of the court's own failure to grant a directed verdict as an order disregarding jury findings.

## V.

Given the conclusion that none of the methods practiced or encouraged by defendants can be found to infringe the Damadian patent, I must, on motion for judgment notwithstanding the verdict, disregard the jury's answers to Questions 6 and 7 with respect to Claims 1 and 2 of the patent.

The jury's answers to Questions 6 and 7 in relation to patent Claims 7, 8, and 10 are supportable on other grounds as well as being compelled for the same reasons I have stated in relation to Claims 1 and 2.

Also, at the commencement of trial, plaintiffs waived all allegations of infringement of other claims of the patent.

■ For these reasons judgment will be entered for defendants declaring that they have neither infringed nor induced infringement of Patent No. 3,789,832.

## VI.

■ The submissions of the parties have not addressed questions as to what judgment should be entered as to issues of invalidity, in view of the determinations of no infringement. *See generally Sinclair & Carroll, Inc. v. Interchemical Corp.,*

325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945) and its progeny, including *Nestier Corp. v. Menasha Corp.-Lewisystems Div.*, 739 F.2d 1576 (Fed.Cir.1984). In these circumstances, the rulings that I express in the remainder of this Opinion are tentative rulings, subject to reconsideration after counsel have had an opportunity, in conference with the court, to propose any modifications they wish to suggest.

The defenses of invalidity submitted to the jury in Question 1–5 having been fully tried, I conclude that it is appropriate to enter judgment as to these defenses upon the verdict unless the verdict is insupportable in some respect.

The jury found patent Claims 7, 8, and 10 invalid because no claimed result was attainable by the steps stated in each claim (Question 2) and because each claim failed to particularly point out and distinctly claim the subject matter of the alleged invention (Question 3(b)).

The jury's findings that the claimed results were not attainable by the steps stated in Claims 7, 8, and 10 were supported by evidence that the laws of physics teach that it is impossible to shape a magnetic field so that it has a maximum along the axis of the electromagnet that generates the field, as described in column 8 of the patent application, and so that along the axis it has a locus of equal field strength, as stated in Claim 7. Even though plaintiffs offered conflicting expert testimony, the jury could permissibly credit the evidence on these matters presented by defendants.

The jury's findings that each of Claims 7, 8, and 10 failed to particularly point out and distinctly claim the subject matter of the alleged invention were supported both by expert evidence to this effect offered by defendants and by the circumstance, as the jury may permissibly have assessed the evidence, that even at trial plaintiffs never explained, either in evidence or in argument, precisely what was the subject matter of Claims 7, 8, and 10.

For these reasons, a judgment of invalidity of Claims 7, 8, and 10 of the patent must be entered upon the findings of the jury.

In view of this determination, I need not address other defense contentions of invalidity of those patent claims on other grounds, as to which the jury found that the defense was not proved by clear and convincing evidence.

Remaining for consideration are the defense contentions of invalidity of patent Claims 1 and 2. The jury found against all invalidity defenses as to these two claims. Taking into account the defense burden of proof by clear and convincing evidence, I conclude as to each of the defenses submitted in Questions 1–5 that the evidence supports the jury verdict that this burden was not met in relation to Claims 1 and 2.

The finding against defense contentions that the subject matter was a phenomenon of nature and was obvious are supported by evidence (a) that the patent claims concern a method for developing standard measurements of $T_1$ and $T_2$ for cancerous and non-cancerous tissues, (b) that these methods are not a natural phenomenon, though they do build upon the natural phenomenon of tissue quality that produces distinctive NMR signals when excited in a certain way, and (c) that these methods of developing standard $T_1$ and $T_2$ values were not obvious to those skilled in the art of NMR spectrometry or any other art. As noted above in this Opinion, the evidence would not support a finding that the development of such standards for detecting cancer has yet been accomplished; nevertheless, the evidence supports the jury finding that defendants have not proved by clear and convincing evidence that the result cannot, in the future, be attained by the steps stated in Claims 1 and 2.

If Claims 1 and 2 were given the impermissible interpretation for which plaintiffs argued in their infringement contentions, a serious issue would be presented as to whether the court should hold that the evidence compels a finding that the specification of the patent fails to state with required clarity and particularity how to make and use the invention. But that impermissible reading of Claims 1 and 2 has been rejected. When one considers instead

a permissible reading of the patent, the jury finding that the defense has failed to prove lack of clarity and particularity of the specification is supportable.

Also, at least in relation to a permissible reading of Claims 1 and 2, I conclude that there is support in the evidence for the jury finding that the defense has failed to prove that Dr. Damadian or his attorney failed to disclose to the Patent Office relevant information that they knew or should have known that a reasonable examiner would have considered important in allowing or rejecting the application.

I therefore conclude that judgment should be entered declaring that defendants have failed to establish invalidity of patent Claims 1 and 2 of Patent No. 3,789,-832.

### Final Judgment

Plaintiffs having withdrawn with prejudice their Second Cause of Action (for unfair competition), and having waived at the commencement of trial all claims in R. Damadian Patent No. 3,789,832 other than Claims 1, 2, 7, 8, and 10, the case having been tried before a jury, and the court having ruled on post-trial motions, for the reasons stated in the Opinion of January 10, 1986, it is hereby ORDERED, ADJUDGED AND DECREED:

1. Defendants Johnson & Johnson and Technicare Corporation have not infringed or induced infringement of Claims 1, 2, 7, 8, or 10 of the Damadian Patent No. 3,789,-832;

2. Claims 7, 8, and 10 of the Damadian Patent No. 3,789,832 are invalid;

3. As to Claims 1 and 2 of the Damadian Patent No. 3,789,832, defendants have failed to establish any of their asserted defenses of invalidity, unenforceability or patent fraud.

4. The complaint is hereby dismissed; and

5. Defendants are awarded their costs in this action.